Filed 8/14/15  P. v. Boyd CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059327 |
| v. | (Super.Ct.No. FSB1200342) |
| CHARLES NELSON BOYD, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Kevin Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant was convicted of grand theft (Pen. Code,[1] § 487, subd. (a)) and the jury found that he had taken property worth more than $200,000 (§ 12022.6, subd. (a)(2)). The trial court imposed and suspended a sentence of three years four months and placed defendant on five years' formal probation. Defendant appeals, contending: (1) the jury committed judicial error by convicting him of the wrong count; (2) there was insufficient evidence that he had the requisite intent to steal under any theory advanced by the prosecution; and (3) we should remand for an evidentiary hearing on whether defendant actually owes the sum of $466,311 or any part thereof as restitution. We reject defendant's claims and affirm.

## I. FACTS AND PROCEDURAL HISTORY

Defendant and appellant Charles Nelson Boyd, a California licensed life and health insurance agent, owned and operated Consumer Driven Benefits Association (CDBA), a group benefits association that offered members benefit packages such as life and accidental death insurance, hospital indemnity, limited supplemental medical insurance, and disability income. In May 2007, defendant obtained a group medical insurance policy from United States Life Insurance Company (U.S. Life) through a sales and marketing company called International Marketing Administration Company (IMAC). The two entered into an organization agreement which provided that defendant was not allowed to offer the limited medical benefits to new groups he brought into CDBA unless he first obtained IMAC's permission. Defendant was also not permitted to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

subcontract the invoicing and billing for premiums that were to be remitted to U.S. Life through IMAC; he was required to handle those administrative matters in-house. IMAC handled U.S. Life's billing as an intermediary through its affiliate, NBFSA Administrative Services (NBFSA). Each month, defendant would send to NBFSA the number of CDBA members who had subscribed to U.S. Life's health insurance policy as part of a lifestyle benefits package. NBFSA would remove any members from the list who were no longer covered, add any new subscribers, and invoice defendant for the amount owed to U.S. Life. Defendant, in turn, would send payment to IMAC.

Cinergy Health, Inc. (Cinergy), like CDBA, was a large consumer benefits corporation and a competitor of CDBA. However, Cinergy had a questionable reputation within the insurance industry. A number of state regulatory agencies across the nation had commenced investigations into Cinergy's practice, and one state had levied a significant fine against the company. Sometime in 2009, Cinergy's insurance carrier terminated its association with Cinergy, leaving Cinergy to find a new insurance carrier. In the summer of 2009, U.S. Life had decided not to do any type of business with Cinergy (including selling insurance to it) because of Cinergy's business practices.

In mid-2009, CDBA started to experience a slight decline in business. When defendant learned about Cinergy's predicament, he offered to provide Cinergy with insurance certificates under his group master policy with U.S. Life. Defendant testified that he had checked with his attorney and understood that, because he was not setting up a separate marketing organization but simply transferring members into his, he could

3

legally accept the Cinergy members. By adding the Cinergy group, defendant now had to manage the supplemental health insurance for an additional 5,500 to 6,000 members. He collected the premiums from Cinergy and was to remit them to U.S. Life through IMAC.

In September 2009, defendant applied directly to U.S. Life[2] to become an agent for that company. U.S. Life appointed him as an agent and entered into an organization agreement with CDBA. As with defendant's organization agreement with IMAC, defendant was not authorized to market insurance products to any groups without first obtaining approval from U.S. Life.

In October 2009, IMAC and U.S. Life learned that defendant had brought the Cinergy group into CDBA and that he had issued insurance certificates to Cinergy members without obtaining the approval of IMAC or U.S. Life. U.S. Life agreed to cover Cinergy members for one month, until December 15, 2009, in order to give defendant time to find a different carrier to cover those members, and took steps to terminate the policy. U.S. Life amended the organization agreement with defendant, such that U.S. Life was able to terminate insurance coverage with 30 days' notice instead of the standard 120 days. Defendant was to provide proof to U.S. Life that he had found a new carrier for Cinergy members.

Defendant failed to fulfill U.S. Life's requirements. He received premium payments from Cinergy and remitted those payments to IMAC to be passed on to U.S.

---

[2] AIG Benefit Solutions (AIG) is a holding company and one of the companies that it owns is U.S. Life.

4

Life in November and December 2009. Meanwhile, because defendant had failed to comply with U.S. Life's requests, U.S. Life terminated the group master policy it had issued to CDBA, and terminated defendant's appointment as an agent for U.S. Life in December 2009. In January 2010, U.S. Life confirmed the termination with defendant; however, as a courtesy to the Cinergy group, it continued to insure that group for one more month, until February 15, 2010. Defendant was to continue to remit the premiums he received from Cinergy to U.S. Life. In January and February 2010, defendant received additional premium payments from Cinergy; however, he failed to remit $466,431.20 of those payments to IMAC or U.S. Life. Defendant never disputed or contested the invoices he received from NBFSA. Thus, U.S. Life was unaware that defendant had any dispute with the billing and the amount of premium he was to pay to U.S. Life.

In his defense, defendant claimed that he had received advice from an attorney that he did not need to comply with the terms of his organization agreements with U.S. Life or IMAC and obtain their permission before issuing certificates of insurance to Cinergy. He also claimed he believed he was being overcharged by IMAC for the insurance benefits U.S. Life provided to the Cinergy group. He noted receipt of a letter from IMAC dated March 5, 2010, which included a payment of $1,465.18, representing overpaid premium on the U.S. Life business. He claimed that he asked IMAC for an audit; otherwise, he always paid his bills. Defendant's letter dated March 13, 2010, to IMAC noted the

March 5, 2010, letter, the refund check, and defendant's request for audit reports in order to determine if he actually owed any monies to U.S. Life.

## II.  DISCUSSION

### A.  The Jury's Verdict Is Valid

When the jury returned its verdict on April 8, 2013, the verdict form submitted to the court indicated the jury had acquitted defendant of count 1, embezzlement by an agent under section 508, and found the special allegation not true.  However, the jury also submitted another form indicating it was convicting defendant of grand theft, but also identifying this count as count 1, rather than count 2, and finding the special allegation true.  Defendant asserts that the jury's verdict is fundamentally flawed because there is both a "GUILTY" and "NOT GUILTY" verdict on count 1, but no verdict on count 2, although that may have been the jurors' intention.  Furthermore, defendant claims that when the jury was polled, it repeated its "GUILTY" verdict on count 1, even though it had just found defendant "NOT GUILTY" and acquitted him on count 1.  Thus, defendant contends the jury committed judicial error by convicting him of the wrong count and such error warrants reversal.  We disagree.

#### 1.  *Further Background Information*

The prosecution charged defendant with embezzlement (§ 508) in count 1 and grand theft (§ 487, subd. (a)) in count 2.  As to both counts, the prosecution alleged a

6

white collar crime enhancement[3] (§ 186.11, subd. (a)(3)) and a great takings[4] enhancement (§ 12022.6, subd. (a)(2)). The jury received two verdict forms for the embezzlement charge (count 1), which provided the following:

Verdict 1A: "We, the jury in the above-entitled action, find the defendant, CHARLES NELSON BOYD, GUILTY of EMBEZZLEMENT as charged in Count 1."

Verdict 1B: "We, the jury in the above-entitled action, find the defendant, CHARLES NELSON BOYD, NOT GUILTY as to Count 1."

The jury also received two verdict forms for the grand theft charge (count 2), which provided the following:

Verdict 2A: "We, the jury in the above-entitled action, find the defendant, CHARLES NELSON BOYD, GUILTY of GRAND THEFT, as charged in Count 1 [*sic*]."

Verdict 2B: "We, the jury in the above-entitled action, find the defendant, CHARLES NELSON BOYD, NOT GUILTY as to Count 2."

The jury returned Verdict 1B and Verdict 2A. However, a closer look at Verdict 2A notes that the charge of grand theft was mistakenly identified as being "charged in Count 1."

---

[3] I.e., both the embezzlement and grand theft were part of pattern of white collar criminal conduct.

[4] I.e., both crimes resulted in a loss of property worth more than $200,000.

7

In relevant part, the court clerk read the verdict: "We the jury in the above-entitled action find the defendant not guilty as to Count 1. Signed and dated by the foreperson. [¶] We the jury in the above-entitled action find the defendant Charles Nelson Boyd *guilty of grand theft* as charged in Count 1. Dated and signed by the foreperson." (Italics added.) The trial court polled the jury, inquiring as to whether those were their verdicts, and they all replied in the affirmative.

2. *Analysis*

To begin with, we note that defendant failed to object to the verdict form in the trial court and thus he has forfeited this issue. (*People v. Bolin* (1998) 18 Cal.4th 297, 330 [defendant forfeited claim of error related to verdict form that contained incorrect code section reflecting prior serious felony conviction on a section 667 finding and, in any event, the erroneous form used by the jury to reflect their finding was not prejudicial]; *People v. Webster* (1991) 54 Cal.3d 411, 446.) "In any event, technical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]" (*People v. Webster*, *supra*, at p. 447.) As part of this analysis, "[a] verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court. It must be upheld when, if so construed, it expresses with reasonable certainty a finding supported by the evidence [citation]." (*People v. Radil* (1977) 76 Cal.App.3d 702, 710.)

8

The trial court has the power to correct clerical errors made in rendering criminal verdicts. (*People v. Harders* (1962) 201 Cal.App.2d 795, 798-799.) In *Harders*, the jury returned two verdicts finding defendant guilty of robbery "'as charged in Count I'" and conspiracy "'as charged in Count II.'" Originally, the indictment charged the defendant with robbery (count I) and conspiracy (count IV). Counts II and III charged other persons with robberies. (*Id.* at p. 798.) During trial, the indictment was amended to delete the charges in counts II and III, leaving only counts I and IV against defendant. (*Ibid.*) The jury found defendant guilty, by separate verdicts of robbery and conspiracy; however, the verdict for conspiracy mistakenly identified the charge as count II. (*Ibid.*) In considering defendant's claim that there was an error in the verdict, the trial court stated: "The jury found defendant guilty, by separate verdicts, of both robbery and conspiracy. The fact that the conspiracy verdict referred to Count II of the indictment is immaterial, and did not render the verdict invalid. The form of the verdict is unimportant where as here the jury has unmistakably expressed its intention to convict the defendant of the crime of conspiracy. [Citations.] Moreover, when the verdicts were returned, defendant's counsel pointed out the numerical inconsistency but made no objection to the correction of the record to show that Count II in the verdict form referred to Count IV of the indictment." (*Id.* at pp. 798-799.)

Here, based on the record before this court, the jury's intent to convict defendant of grand theft is unmistakably clear. The information charged defendant with embezzlement in count 1 and grand theft in count 2. The jury was instructed on both

9

embezzlement and grand theft. And, in closing argument, the prosecutor identified count 1 as the embezzlement charge and count 2 as the theft charge. The flaw in the above forms is found in the misidentification of the grand theft charge as being count 1 in Verdict 2A. However, the count specifically identified the charge as "grand theft."[5] Such designation trumps the typographical error of identifying the charge as being count 1. Moreover, the jury did not use Verdict 2B (not guilty of count 2), instead indicating they had found defendant guilty of count 2, grand theft.

The jurors must have understood there were two charges, embezzlement and grand theft, and there is no dispute that the jurors convicted defendant of grand theft only as stated in Verdict 2A, even though it was misidentified as being count 1. Additionally, defendant failed to object to the verdict forms and he did not raise any issue when the Verdict 2A was read, misidentifying the grand theft charge as being count 1. Thus, the minute order correctly notes that defendant was convicted of grand theft as alleged in count 2. Such correction was to the form of the verdict, not the verdict itself. (Cf. *People v. Trotter* (1992) 7 Cal.App.4th 363, 369-370.) Because defendant was not prejudiced by the defective verdict form, we need not reverse his conviction of grand theft.

---

[5] Defendant's briefing omits the fact that while Verdict 2A incorrectly referred to count 1, it correctly referred to the charge of grand theft. Likewise, defendant fails to note that when the clerk read the verdict that incorrectly referred to count 1, it correctly referred to a finding of guilt as to the charge of grand theft. Defendant states, "Nowhere did the jury ever state its intention to convict [defendant] of Count 2—not on the verdict form, not when polled in open court." However, the jury did state its intention to convict defendant of grand theft both in Verdict 2A and when polled.

**B. The Evidence Supports Defendant's Conviction of Grand Theft**

Defendant contends the evidence is insufficient to support his conviction of grand theft. He argues that the evidence fails to show he had the requisite intent to steal because he disputed what IMAC claimed he owed and he requested an audit to verify the correct amount. Thus, he asserts that he was willing to pay what was owed to IMAC, demonstrating a lack of any intent to steal. We find sufficient evidence to support the jury's verdict.

*1. Standard of Review*

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there

11

sufficient substantial evidence to support [the conviction].'" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)

2. *Analysis*

In charging defendant with grand theft, the prosecutor proceeded under two theories: that defendant engaged in theft (1) as an agent or (2) by trick. Regardless of the theory relied upon, defendant challenges the sufficiency of evidence of his intent to steal. Intent "is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 643.) An intent to steal is inferred when a person takes another's property. (*People v. Tufunga* (1999) 21 Cal.4th 935, 943.) Here, the record discloses such evidence.

First, defendant acknowledges that Cinergy sent CDBA payments totaling $2,895,170.08 from November 19, 2009, through March 10, 2010, and that IMAC, through NBFSA, sent CDBA invoices covering that same period totaling $2,246,756.48. Of the total amount invoiced on behalf of IMAC and U.S. Life, defendant admits that he paid IMAC a total of $1,780.325.73 and withheld $466,431.20. He claims that he intended to withhold that amount because he "became concerned that he was not making the money from the large new influx of Cinergy business . . . [and] suspect[ed] that IMAC, through NBFSA, might be overbilling him. Nonetheless, instead of contacting IMAC, NBFSA, or U.S. Life to dispute or contest the invoices he received for the insurance premiums, he simply took matters into his own hands and kept $466,431.20.

12

While defendant claimed that he believed he was being overbilled and asked for an audit, the only evidence supporting such claim was his testimony and a letter he wrote to IMAC dated March 13, 2010. The jury rejected his self-serving claims. Defendant's failure to pay the full amount invoiced to him, coupled with his failure to dispute the amounts on the invoices, demonstrates an intent to deprive IMAC and U.S. Life of the property that rightfully belonged to them.

Second, as an insurance agent, defendant had a fiduciary duty to remit the insurance premiums he received from Cinergy to U.S. Life through IMAC. (Ins. Code., § 1733.) According to the evidence, in order to offer U.S. Life's insurance products, defendant was required to be a licensed insurance agent. As an agent, defendant received insurance premiums from Cinergy and remitted them to U.S. Life through IMAC. Although defendant questions whether the funds Cinergy sent to him qualified as insurance premium payments, the fact remains that he was a licensed insurance agent who failed to remit the premiums payments to U.S. Life in January and February 2010, thus breaching his fiduciary duty as an insurance agent.

Third, the jury heard evidence that defendant's business was in a decline when he offered to provide Cinergy with insurance certificates under his group master policy with U.S. Life. When U.S. Life terminated his appointment as an insurance agent for the company and cancelled his group master insurance policy in December, defendant's business would have naturally experienced a more significant decline. In addition to losing Cinergy's business, defendant would be unable to provide the supplemental

13

medical benefits to CDBA's members. As the people assert, such loss provides a motive to withhold insurance premiums in January and February 2010 from U.S. Life in an effort to keep his company afloat.[6]

We conclude the evidence presented to the jury reasonably justifies its verdict.

## C. No Restitution Hearing Was Required

Defendant contends the trial court abused its discretion in failing to hold a hearing to determine the amount of restitution he owed to IMAC and U.S. Life. He asserts that he should have been provided an opportunity to prove that he did not actually owe the full amount that he withheld from them. We disagree.

"'[T]he Legislature intended victim restitution as a civil remedy rather than as a criminal punishment.' [Citation.]" (*People v. Millard* (2009) 175 Cal.App.4th 7, 35; see also *People v. Harvest* (2000) 84 Cal.App.4th 641, 649.) The hearing is comparable to a civil hearing because direct victim restitution serves to compensate crime victims for their losses, rather than to punish defendants. (See § 1202.4, subd. (a)(3)(B) ["Restitution to the victim or victims, if any, in accordance with subdivision (f), which shall be enforceable as if the order were a civil judgment"]; see also *People v. Millard*, *supra*, at p. 35 [describing restitution as a civil remedy rather than a criminal punishment which does not constitute double jeopardy].) "The requirements of due process are satisfied by providing the defendant a hearing on . . . the extent of the loss occasioned by the defendant's criminal conduct." (*People v. Baumann* (1985) 176 Cal.App.3d 67, 79; see

---

[6] Defendant later filed for bankruptcy.

§ 1202.4, subd. (f)(1) ["The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution"].) "A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542 [Fourth Dist., Div. Two].)

During the trial, the prosecution established a prima facie showing of the amount of restitution ($466,431.20) that was set. (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 [victim's submission of a claim makes a prima facie showing of the amount of victim's damages].) At sentencing, the court imposed restitution in the amount of $466,431.20, payable to IMAC. When asked if defendant objected to any of his terms of probation, he replied, "Why should I be paying IMAC anything?" Defendant's counsel agreed there was ample testimony about the figures used to calculate restitution, "so we do not need anymore [*sic*] facts." Nonetheless, he questioned whether the restitution amount erroneously included a 27 percent markup. The prosecutor explained that the industry practice was to allow for such markups, and even defendant had done the same in his offerings to CDBA members. The court concluded: "I think factually we heard all the testimony about the amounts. I don't think there is any further restitution hearing required. I do believe that the amount as indicated by the People was the amount testified to in Court by various witnesses."

15

Considered as a whole, the record indicates the trial court held a restitution hearing, and ~~that~~ the hearing comported with due process. (*People v. Giordano* (2007) 42 Cal.4th 644, 663-664.) While defendant may not agree with the court's calculation of the amount of restitution, such disagreement does not mean that the court failed to "analyze the evidence presented," and to state how it calculated the amount of restitution. (*Ibid.*) Given the evidence presented at trial, coupled with defense counsel's concession that no further facts were needed to calculate restitution, the trial court found that no additional restitution hearing was necessary. In light of what was presented at trial and at sentencing, we agree. We find no abuse of discretion in not granting a further hearing on the amount of restitution. Moreover, given the evidence presented at trial, the trial court's restitution order does not amount to an abuse of discretion.

### III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST  
Acting P. J.

We concur:

MILLER  
J.

CODRINGTON  
J.

16